IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 4, 2005

**STATE OF TENNESSEE v. VIVIAN BRAXTON**

**Appeal from the Criminal Court for Shelby County**
**No. 03-05618     John P. Colton, Jr., Judge**

———————

**No. W2004-02506-CCA-R3-CD  - Filed November 10, 2005**

———————

The Defendant, Vivian Braxton, pled guilty to one count of theft between ten and sixty thousand dollars, a Class C felony.  After a sentencing hearing, the trial court sentenced the Defendant as a Range I, standard offender, to three years to be served as follows:  six months in the County Workhouse with the remainder suspended, and three years of probation to follow the confinement. The Defendant now appeals, contending that the trial court erred in declining her request for judicial diversion; denying her request for full probation; and in ordering her to serve six months day-for-day in confinement.  We modify the Defendant's sentence insofar as removing any requirement that she serve her period of confinement day-for-day.  In all other respects, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed as Modified**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Leslie Ballin, Memphis, Tennessee, for the appellant, Vivian Braxton.

Paul G. Summers, Attorney General & Reporter; Jennifer L. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; Linda Kirklen, Assistant District Attorney General; and Mike Meyers, Assistant Attorney General Special Prosecutor, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

     Robert Dinkelspiel testified that he is the appointed receiver for Pee Wee Wisdom Child Development Center in Memphis, a nonprofit corporation ("the Center").  He further testified that the day-to-day operations of the Center were handled by the Defendant's sister, Jean Johnson.  The Defendant was a salaried employee of the Center and acted as an overseer.  Mr. Dinkelspiel stated

that, as receiver, he is responsible for handling the financial affairs of the Center and investigating whether there had been "any financial impropriety with regard to the operation of that center." He explained that his investigation had not yet been completed, but that he had conducted an inquiry into the payment of rent by the Center.

Mr. Dinkelspiel explained that the Defendant and her husband owned the land and the building in which the Center was located and operated. Accordingly, the Center had paid rent to the Defendant and her husband since its opening in 1994. As part of his inquiry, Mr. Dinkelspiel hired two experts to determine the fair rental value of the property from 1994 forward. One of the experts determined that the reasonable annual rental value for the property in 1994 was $29,172. The other expert determined that the reasonable annual rental value for the property in 1994 was $48,856.60. In conducting his investigation, Mr. Dinkelspiel averaged these two figures, arriving at the sum of $39,014.30. Mr. Dinkelspiel compiled these figures for years 1994 through 2003. By doing so, he arrived at a total average reasonable rental value for that entire period of time of $446,684.30.

Mr. Dinkelspiel then calculated the rent payments that the Defendant was paid during that time period, using the figures reported on the Center's Form 990: a report that nonprofit corporations are required to file with the Internal Revenue Service ("the IRS"). The total dollar amount reported to the IRS as paid in rent payments by the Center from 1994 through 2003 was $777,200. Subtracting the cumulative reasonable rental value from the cumulative actual rental paid, Mr. Dinkelspiel determined that the Center had overpaid rental to the Defendant and her husband in the amount of $330,515.70 for the years 1994 through 2003.

Mr. Dinkelspiel also testified that, in January 1994, the Defendant had an appraisal of the property performed. According to that appraisal, the reasonable annual rental value of the property in 1994 was $27,500. Mr. Dinkelspiel then applied a three percent rate of inflation over the ensuing years and arrived at a total reasonable rental value for the period 1994 through 2003 of $315,256.68. Using the Defendant's own 1994 appraisal, Mr. Dinkelspiel determined that the Defendant had been overpaid over $400,000.

Mr. Dinkelspiel explained that the Center was "very, very heavily subsidized by the State of Tennessee with regard to payment of tuition, that is child care expense and food by the State of Tennessee."[1] In conjunction with these subsidies, the State required the Center to collect a "co-pay" from the parents of the children enrolled at the center. Mr. Dinkelspiel stated that his investigation revealed that the Center should have been collecting approximately $2,000 per month from parents in co-payments.[2] The Form 990 filed with the IRS indicated that, in 1994, the Center collected $71,259 in parental fees. The Form 990 filed with the IRS for 1995 indicated receipts from parental fees of $63,643; 1996 fees were $56,863; 1997 fees were $3,886. The Forms 990 filed for years

---

[1] The defense stipulated at the Defendant's guilty plea hearing that the Defendant "received approximately three-point-five million dollars from the State of Tennessee to care for children that came to her day care."

[2] Apparently, the Center also collected fees from "private pay" parents, whose children were not subsidized by the State.

1998 through 2002 indicated that the Center collected no parental fees for those periods. As to the fees that were collected, Mr. Dinkelspiel testified, "[w]e're not comfortable with where all that cash went."

Mr. Dinkelspiel also testified that the Defendant had repaid $65,877.49 to him as receiver for the Center pursuant to a promissory note held by the Center on which she was liable. A balance of $15,097.72 remained due under the note. The note was not related to the amounts he deemed the Center to have overpaid in rent.

When asked about his dealings with the Defendant, Mr. Dinkelspiel described her as "hostile." He continued: "it's been unpleasant whenever I have to deal with her," and "[she] has abused me and my staff on numerous occasions." Mr. Dinkelspiel added that, as of April 2004, there continued outstanding a set of interrogatories that he had submitted to the defense in October 2003.

Angela Graves testified that she is an attorney and certified public accountant. She reviewed the Center's financial data in conjunction with Mr. Dinkelspiel's receivership. She determined that in 2003, the year in which Mr. Dinkelspiel was appointed receiver, the Center collected $64,600 in parental fees. This money had not been turned over to the receiver, however.

Ms. Graves also examined the Defendant's IRS Forms 1040 for years 1994 through 1999. For year 1996, the Defendant reported receiving $60,000 in rental income from the Center. However, the Form 990 for that year indicates that the Center reported paying the Defendant and her husband a total of $150,000 in rental payments. The total difference between the rental reported as paid by the Center, and the rental reported as received from the Center, was $111,000 for years 1994 through 1999; that is, the Defendant under-reported her income by a total of $111,000 over the course of those six years.

Mr. Van Drayton testified that he works for a private probation company and had reviewed the Defendant's presentence report. He testified that his company would be able to supervise the Defendant in either a primary or secondary capacity should she be released on probation. The Defendant would bear the expense of his company's participation.

James Wright, certified public accountant, testified that the Center had been a client of his since 1993, having been hired at that time by the Defendant. He has prepared the general ledger and the financial statements for the Center since 1994.

Mr. Wright explained that, initially, he received separate checks for rental payments from the Center: one for the rental of vans and one for the rental of the real property. Later, these payments were consolidated into a single check and he reported both forms of rent as "rent." He testified, "it was still understood that it was for both the van rental and for the rent."

Mr. Wright explained that the Center participated in a food program on a "cost reimbursement" basis. That is, the Center would purchase food for the enrolled children and then

submit a document to the State for reimbursement of the cost. Mr. Wright stated that he performed audits of the food program at the Center and never found any discrepancies.

Mr. Wright was familiar with a 1999 payment in the sum of approximately $90,000 that the Center made to the Defendant as "back rent." He explained that this sum was "basically a reimbursement for funds that, well, she had spent to get that corporation up and going." He testified that, when he initially viewed the Center prior to its opening, "it was just a shell." The Defendant provided the money to convert the property into an operational day care center. The Defendant also provided the money needed to buy initial equipment and supplies.

Mr. Wright was also familiar with a transaction whereby the Defendant used funds from the Center to perform renovations at one of her for-profit day care centers. When he discovered this transaction, he called the Defendant and informed her that the transaction was improper and the money would have to be repaid. He prepared the necessary documents to reflect the repayment and told her that the rehabilitative transaction would have to be approved by the Center's board of directors. Mr. Wright stated that he prepared an interest-bearing promissory note for the repayment. He explained that, in order to set the interest rate, he would "usually try to see what prime is and I think I knocked it up a couple of percentages." The note required monthly payments by the Defendant, which she made.

Mr. Wright testified that the amount of money the Defendant took from the Center to renovate her for-profit center was approximately $108,000. The amortization schedule for her repayment of this sum was ten years. The Defendant provided him with a document reflecting board authorization of the repayment transaction. Mr. Wright testified that the promissory note for the repayment of the money diverted from the Center bore the signatures of all of the board members.

Mr. Wright testified that, due to his oversight, he failed to prepare Forms 1099 for the Defendant reflecting rents that the Center paid to her. These forms would have been sent to the Defendant for her use in calculating and reporting the rental income she received from the Center. Mr. Wright testified that he did not prepare the Defendant's individual tax returns until after the investigation began.

On cross-examination, Mr. Wright acknowledged that the "back rent" payment may actually have been made in 1996. He stated that he was given "[n]o board minutes, no documentation" in support of that payment. He further explained that his documents reflected that the Defendant had spent $15,797 in start-up costs for equipment, including playground equipment. He stated that he had never seen a contract between the Defendant and the State for the provision by the State of funds for start-up costs.

On redirect, Mr. Wright testified that, in addition to the $15,000 in start-up costs for equipment, another $259,000 was spent in start-up costs. Mr. Wright testified that, as far as he knew, that money came from the Defendant's personal funds. He did not know if the Center ever received a grant for start-up costs.

Mr. Wright acknowledged that the improvements made to the real estate that eventually housed the Center would belong to the Defendant once the Center vacated the premises.

Anthony Carter testified that he is a sergeant with the City of Memphis Police Department. He stated that, with the assistance of the Defendant and Florence Mason, he had enrolled his three daughters with one of the Defendant's for-profit Pee Wee Centers. He stated that the Defendant "always appeared to be [a] caring person, warm and always willing to do whatever she could to try to help anybody." He testified that he has known the Defendant since 1991 and has seen her three day care centers grow in that time. Her top priority appeared to be "providing for the children." In his opinion, the Defendant's forging signatures and providing false documents would be inconsistent with her character. Sgt. Carter stated that he supported the Defendant's request for diversion or probation. He testified: "There's been some misfortunes that have occurred, but overall I look at [the Defendant] as being someone who is very conscientious about what she does, takes pride in trying to do the very best and provide the best service that she can."

Danny Fay testified that he is a Special Agent with the Tennessee Bureau of Investigation. In that capacity, he investigated allegations against the Defendant at the request of the District Attorney General's office. In conjunction with his investigation, he took a sworn statement from the Defendant, in the presence of her attorney, in which "she confessed to the allegations."

Agent Fay explained that, during his investigation, "it was determined that [the Defendant] made about a thirty-five hundred square foot addition to the for-profit center using State money, which is a crime." The Defendant told him that she took the money from the Center because "she had no conventional way of getting that money."

Agent Fay agreed that this case had been "highly publicized." He also agreed that the theft of public funds was a "problem" in Shelby County. He added: "unfortunately this is a problem that we're having and I'm seeing more and more of it." He also stated, however, that he was "stunned" when he learned that the Defendant was repaying the money that she had misappropriated from the Center.

The Defendant testified that she is fifty-six years old, has been married thirty-three years and has one grown daughter. She has a master's degree in guidance and counseling. She has worked as a teacher. She has no prior criminal record. The Defendant testified that she does not drink alcohol or use illegal drugs. She attends church. She has hypertension and has taken prescription medication for depression.

The Defendant admitted to having forged the signatures of board members to a document drawn up by Mr. Wright and she admitted to having falsified minutes. She knew at the time that her actions were wrong but stated that, "at the time that I was doing it, I didn't give too much thought to it. It was just, you know, it was convenient and I did it out of convenience, I guess." The Defendant stated that she was "immensely, . . . terribly sorry" for her criminal actions and that she

accepted responsibility for them. She testified that she was "truly remorseful" and explained that her actions were "totally out of character."

As to the reason for her misappropriation of Center funds, she testified:

I had the opportunity to buy a property next door to my for-profit center. And at that time I tried to get financing from the bank and was basically turned down. The property was purchased with the intent of providing some kind of cover for the school aged children, who at the time was occupying a space within the center, the main center. And the summers had just gotten so hot, I decided it would be nice, you know, if I could actually have the place renovated, you know, so the children could actually be out of the sun for a portion of time and, you know, we could switch their activities, some activities in and some out.

She did not realize that using the Center's fund for this purpose was wrong until Mr. Wright informed her that she "couldn't do that." Thereafter, she signed the promissory note that Mr. Wright prepared, which bore an interest rate of "seven or seven and a half" percent. Following that, she made payments on the note on a monthly basis.

As to the payment of $90,000 in "back rent," the Defendant explained:

I at some point, I don't know, I discovered that I was only receiving real estate rent, and that was rent for the real property, which was the building, the square footage and the like. I was not receiving rent for the contents. I had approximately $60,000.00 worth of contents and I had not been paying myself rent for the personal property. So I approached Mr. Wright about the personal property as well as the start-up money. And he told me to give him the receipts, and I did, the same receipts that I have since given to the receiver. And he did a calculation, came up with that schedule and told me that I was entitled to about $90,000 based on his calculations.

As to the discrepancies between the amount of rent the Defendant was paid by the Center and the amount of rental income that she reported to the IRS, the Defendant testified that her system for keeping up with receipts was "flawed." She stated, "I wasn't trying to get away with not reporting that." Rather, she did not keep sufficiently accurate records.

The Defendant testified that, over the years, the number of "private pay" children in the Center decreased until, eventually, the Center's children were all subsidized. As to collecting the co-pays due on these children, the Defendant stated, "we collected what the parents paid. You know, we didn't harass them for payment."

The Defendant stated that it was Mr. Dinkelspiel who had spoken "very harshly" to her when she called to inquire about one of her servicemen being paid.

-6-

With regard to her punishment, the Defendant stated that she did not want to go to jail, but wanted to continue her work in child care. She continued:

Child care has been my life and I know that, you know, the paper transactions was wrong. I know I did wrong there. But as far as caring for folk's children, I do have a genuine passion for what I do. I have a genuine passion for what I do. And I have invested all of my life and, you know, these children depend on me.

The Defendant explained that she also did not want to be confined to her home because she would not be able to interact with the children from there. She stated:

I get more enjoyment out of just walking around [the day care center] and holding hands and singing songs and clapping and that sort of thing.

She continued:

if the judge allows me to stay out of jail, I'll do everything in my power, I guess, to try to redeem myself because I am a good person regardless of what the figures point out, I am a good person. And I spend the majority of my time and a great deal of the money that I take in for the day care children.

The Defendant stated emphatically that the Center never received any grant money from the State for start-up money. She testified that the money needed to get the Center operational was her "personal money."

On cross-examination the Defendant admitted that she had fabricated the minutes of a board meeting with regard to approving the $90,000 payment of back rent to her. She explained that the $90,000 actually represented both back rent for the use of the personal property with which she had equipped the Center, and reimbursement for some start-up costs. She also explained that, during the years that she was charging the Center $10,000 a month for rent, that sum included both real property rent and personal property rent. For the real property rent, she used $1.50 per square foot as her calculation.

The Defendant acknowledged that, before she appropriated the $108,000 from the Center for improvements to one of her for-profit centers, she did not apply for a bank loan. She stated that, a short time prior to that, she "had met with a great deal of resistance when [she] tried to get a loan to purchase the property next to [her]."

After the sentencing hearing, the trial court entered a written sentencing order. The trial court reviewed the testimony and found that "[i]t appears from the record that almost half a million dollars were received by Defendant illegally." The court continued:

Considering diversion the court reviewed factors in granting or denying it. The court finds that the circumstances of this offense are totally repugnant to society

and to this geographic area. Public funds provided by statute to help poor children and poor parents to better themselves and provide care for indigent children while poor parents attempt to work were literally stolen from these less fortunate people and the public coffers. Diversion from this record would not serve the public. The deterrence value to the convicted Defendant and others not convicted must be considered. This court finds from the record that Judicial Diversion will not serve the interests of the public or the Defendant.

The circumstances of the offense are of such a nature as to outweigh all other factors favoring probation. The best interests of the public must again be looked at as well as that of the Defendant. The court notes a certain lack of candor from Defendant. The proof shows an educated person who has degrees. The record reflects calculated taking of public money, which could be used to help less fortunate folks and a scheme that seemed to start when Defendant served on the board of another care taker Mrs. Madison.

This court further finds other incidents in this community have been increasingly present regarding matters of this [kind]. The Defendant[']s crime was the result of intentional, knowing and reckless conduct and motivated by a desire to profit or gain from the criminal behavior.

The Defendant knew from previous work with Ms. Madison that she could use the same type of criminal conduct or scheme.

This court finds for all of the stated reasons it cannot grant total probation. Defendant would be eligible for parole under our law in approximately one year without diversion or probation.

Since Defendant is taking medication for emotional problems and made some restitution the Court finds Defendant must serve six months day per day, be put on three years of probation after that, and make restitution to the State of Tennessee in an amount to be determined by the local Chancery Court . . . .

The Defendant now challenges the trial court's sentencing decision, claiming that the trial court erred in not granting her either judicial diversion or full probation, and also that the trial court's order of six months of confinement "day per day" is excessive and denies her "good conduct credits."

## STANDARD OF REVIEW

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114;[3] and (f) any statement the defendant wishes to make in the defendant's own

---

[3] We note that the legislature has recently amended several provisions of the Criminal Sentencing Reform Act of 1989, said changes becoming effective June 7, 2005. However, the Defendant's crime in this case, as well as her

(continued...)

behalf about sentencing. See Tenn. Code Ann. § 40-35-210(b); State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001).

Upon a challenge to the sentence imposed, this court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. See Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then the presumption is applicable, and we may not modify the sentence even if we would have preferred a different result. See State v. Fletcher, 805 S.W. 2d 785, 789 (Tenn. Crim. App. 1991). We will uphold the sentence imposed by the trial court if (1) the sentence complies with the purposes and principles of the 1989 Sentencing Act, and (2) the trial court's findings are adequately supported by the record. See State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401 Sentencing Commission Comments; Arnett, 49 S.W.3d at 257.

## I. Denial of Judicial Diversion

The Criminal Sentencing Reform Act of 1989 provides that, after accepting a guilty plea, a trial court

> may defer further proceedings against a qualified defendant and place such defendant on probation upon such reasonable conditions as it may require without entering a judgment of guilty and with the consent of the qualified defendant. Such deferral shall be for a period of time not less than the period of the maximum sentence for the misdemeanor with which the person is charged, or not more than the period of the maximum sentence of the felony with which the person is charged.

Tenn. Code Ann. § 40-35-313(a)(1)(A). This form of probation is known as "judicial diversion" and has been described by our supreme court as "legislative largess." State v. Schindler, 986 S.W.2d 209, 211 (Tenn. 1999). The Defendant in this case is a "qualified defendant" because she has pled guilty to an eligible offense and has not previously been convicted of a felony or a Class A misdemeanor. See Tenn. Code Ann. § 40-35-313(a)(1)(B)(i).

---

[3](...continued)
sentencing, predate the effective date of these amendments. Therefore, this case is not affected by the 2005 amendments, and the statutes cited in this opinion are those that were in effect at the time the instant crime was committed.

Before determining whether to grant or deny judicial diversion, a trial court must consider the following factors: "(a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the status of the accused's physical and mental health, and (f) the deterrence value to the accused as well as others." State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). Additionally, the trial court should consider the accused's attitude, behavior since arrest, emotional stability, current drug use, past employment, home environment, marital stability, family responsibility, general reputation, and the likelihood that judicial diversion will serve the ends of justice and best interests of both the public and the accused. See State v. Cutshaw, 967 S.W.2d 332, 343-44 (Tenn. Crim. App. 1997).

> Moreover, the record must reflect that the court has weighed all of the factors in reaching its determination. The court must explain on the record why the defendant does not qualify under its analysis, and if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others.

State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citation omitted).

We review a trial court's decision on whether or not to grant judicial review under an abuse of discretion standard. See Cutshaw, 967 S.W.2d at 344. Where the trial court follows the required procedure for determining whether or not to grant judicial diversion, we must affirm the trial court's ruling if any substantial evidence exists to support it. See id.

In this case, the trial court determined to deny diversion on the bases of the circumstances of the offense; deterrence considerations; the Defendant's "lack of candor"; and because diversion would not serve the interests of the public or the Defendant. There is substantial evidence in the record to support the trial court's decision. Moreover, these factors together provide a proper basis upon which to deny diversion.[4]

As noted by the trial court, the Defendant is an educated woman. She has been in the day care business for many years. She sat on the board of Cherokee Children and Family Services, a child care broker, from 1992 to 1999. When she created the nonprofit Center in 1993-94, Mr. Wright made her fully aware "about the importance of making sure that it wasn't treated as an owned entity. That it was a community entity and that it belonged to the people and the individual was no more than just an employee. And anything that was done that was out of the ordinary operations of the corporation had to have board approval." He further testified that "it was always understood that . . . [the Center] was . . . an entity that belonged to the people." Indeed, the Defendant admitted that, at the time she created the Center, she understood the significance of its

---

[4]The Defendant asserts in her appellate brief that the trial court devoted "a mere paragraph" to setting forth its analysis on the Defendant's request for judicial diversion. We read the trial court's sentencing order more broadly. While the trial court referred to "probation" in the remaining paragraphs of its order, we note that judicial diversion is a form of probation. See Tenn. Code Ann. § 40-35-313(a)(1)(A). Accordingly, we read the trial court's findings regarding the Defendant's suitability for full probation as applicable equally to her suitability for judicial diversion.

nonprofit status and that the Center's assets were to be used to provide quality daycare services to the working poor.

Nevertheless, beginning in 1996, the Center began paying rental to the Defendant far in excess of what her own appraiser told her it was worth. In addition to this inflated monthly rent, the Defendant arranged for a $90,000 payment of "back rent."[5] Subsequently, the Defendant withdrew $108,000 from the Center to use for improvements to one of her for-profit facilities. When he learned of this withdrawal, Mr. Wright advised her that the transaction was improper and the money would have to be repaid. Although she was informed that the Center's board of directors would have to approve the transaction, the Defendant falsified minutes and signatures to make it appear as though Board approval had been obtained.

This evidence points to the conclusion that the Defendant knowingly and intentionally bilked the Center out of substantial funds. Her partial repayment of the funds she "borrowed" to improve another of her facilities does not overcome the egregiousness of the Defendant's conduct. Nor does the use to which she put the money excuse the Defendant's behavior. The Defendant makes much of the fact that the "borrowed" money was used to better another child care facility. We are not persuaded. The improvements still accrued to the Defendant's benefit, as she owned the real property that was being improved. She also operated it as a for-profit facility. Moreover, the improvements do not account for the exorbitant rent monies she charged the Center.

The Defendant repeatedly misused taxpayer money, over an extended period of time. The trial court found not credible the Defendant's protestations that her actions were merely the results of mistakes and convenience and poor record keeping. We will not second-guess the trial court in this regard. The Defendant's lack of candor suggests a reduced capacity for rehabilitation. These factors are sufficient to support the trial court's denial of judicial diversion.

Moreover, considerations of deterrence also support the trial court's denial of judicial diversion. Our supreme court has instructed us to presume that

> a trial court's decision to incarcerate a defendant based on a need for deterrence is correct so long as any reasonable person looking at the entire record could conclude that (1) a need to deter similar crimes is present in the particular community, jurisdiction, or in the state as a whole, and (2) incarceration of the defendant may rationally serve as a deterrent to others similarly situated and likely to commit similar crimes.

State v. Hooper, 29 S.W.3d 1, 10 (Tenn. 2000) (footnote omitted). Factors indicating a need for deterrence include proof that (1) incidents of the charged offense are increasingly present in the community; (2) the defendant's crime was the result of intentional, knowing, or reckless conduct or

---

[5]The Defendant approved a similar transaction while sitting on the board of Cherokee Children and Family Services to the benefit of Ms. Willie Ann Madison, the organization's executive director.

was otherwise motivated by a desire to profit or gain from the crime; (3) the defendant's crime received substantial publicity exceeding that of the typical case; (4) the defendant was a member of a criminal enterprise; and/or (5) the defendant previously engaged in criminal conduct of the same type as the instant offense. See id. at 10-12. "These factors are meant to serve only as a guide, and a court need not find that all of these factors are present before ordering incarceration based on a need to deter similar crimes." Id. at 12.

Here, Agent Fay testified that the theft of public funds in Shelby County was a problem, and that he was seeing "more and more of it." Agent Fay also testified that this case was "highly publicized." He referred to newspaper articles, articles on the internet, and a press conference including several television and radio stations on the day the Defendant was indicted. Copies of newspaper articles were admitted into evidence. Representatives of the press were present at the sentencing hearing. These factors, together with the nature of the Defendant's criminal conduct, support the trial court's determination that diversion should be denied in order to deter further criminal activity. All of these factors also support the trial court's conclusion that diversion in this case would not serve the public's interest.

In sum, we see no abuse of discretion by the trial court in denying the Defendant's request for judicial diversion. This issue is without merit.

## II. Denial of full probation

We turn now to the Defendant's contention that the trial court erred by not fully probating her sentence. A defendant is eligible for probation if the actual sentence imposed upon the defendant is eight years or less and the offense for which the defendant is sentenced is not specifically excluded by statute. See Tenn. Code Ann. § 40-35-303(a). The trial court shall automatically consider probation as a sentencing alternative for eligible defendants; however, the defendant bears the burden of proving his or her suitability for probation. See id. § 40-35-303(b). No criminal defendant is automatically entitled to probation as a matter of law. See id. § 40-35-303(b), Sentencing Commission Comments; State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997). Rather, the defendant must demonstrate that probation would serve the ends of justice and the best interests of both the public and the defendant. See State v. Souder, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002).

In determining whether to grant probation, the court must consider the nature and circumstances of the offense; the defendant's criminal record; his or her background and social history; his or her present condition, both physical and mental; the deterrent effect on the defendant; and the defendant's potential for rehabilitation or treatment. See id. If the court determines that a period of probation is appropriate, it shall sentence the defendant to a specific sentence but then suspend that sentence and place the defendant on supervised or unsupervised probation either immediately or after the service of a period of confinement. See Tenn. Code Ann. §§ 40-35-303(c), -306(a).

For the same reasons that the record supports the trial court's denial of judicial diversion, we conclude that the record supports the trial court's denial of full probation. This issue is without merit.

### III. Length of confinement

The Defendant argues that the six month period of confinement ordered by the trial court is excessive. The Defendant's argument on this issue in her appellate brief is limited to the following statement: "If a brief period of confinement is deemed to be necessary, [the Defendant] urges the court to consider the principles of sentencing under the Criminal Sentencing Reform Act and to use its discretion in ordering an appropriate term of incarceration." We are not persuaded that the Defendant's six month term of confinement is excessive or is in any way contrary to the principles of sentencing. The trial court conducted an extensive sentencing hearing and issued a comprehensive order addressing all of the issues raised. The trial court, and not this Court, was in a position to observe the Defendant and assess her credibility and potential for rehabilitation. We see no error by the trial court in ordering the Defendant to serve six months in confinement. No error having been demonstrated, we hold this issue to be without merit.

### IV. Order that period of confinement be served "day per day"

The trial court ordered the Defendant to serve six months of confinement in the workhouse "day per day." In this, the trial court erred.

> Where a period of confinement is imposed, an order of day-for-day service is impermissible because a trial court cannot deny a defendant the statutory right to earn good conduct credits or authorized work credits where the defendant receives a sentence of split confinement and becomes a county jail inmate.

State v. Chris E. Hixson, No. M2002-03141-CCA-R3-CD, 2004 WL 741670, at *2 (Tenn. Crim. App., Nashville, April 7, 2004). Good conduct credits apply to felons serving less than one year in the county workhouse. See Tenn. Code Ann. § 41-2-111(b); State v. Michael E. Owenby, No. E2001-02012-CCA-R3-CD, 2002 WL 2012653, at *3 (Tenn. Crim. App., Knoxville, Aug. 28, 2002).

We note, however, that the actual judgment entered against the Defendant on October 11, 2004,[6] makes no reference to the Defendant serving her confinement "day for day." The only document in which we have found this language is the trial court's written order setting forth the judge's findings of fact and conclusions of law regarding the Defendant's sentence, which order was entered on October 7, 2004. Out of an abundance of caution, we hereby modify the order to the extent of deleting the "day per day" language. The Defendant will thus be entitled to any good

---

[6]In fact, the technical record before this Court contains two judgments memorializing the Defendant's conviction. The first was entered on April 23, 2004, the same date as the Defendant's sentencing hearing. This initial judgment indicates that the Defendant is sentenced to three years in the Workhouse. The second judgment, entered October 11, 2004, differs only insofar as it indicates that the Defendant is to serve six months in confinement prior to being released on probation. Neither judgment document makes a reference to "day for day" service of the period of confinement.

conduct credits she earns, which will apply toward her six months of confinement.  See Owenby, 2002 WL 2012653, at *3.

**CONCLUSION**

The judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE